The Honorable, the judges of the United States Court of Appeals for the 4th Circuit. All right, the first case we're going to hear is United States v. Chavez-Lopez and I guess Mr. Carpenter, we hear from you. May it please the court, we're asking to reverse the conviction here because the government's key evidence, data that was forensically extracted from five cell phones, should not have been admitted at trial. Short of that, we're asking for a resentencing because the career offender enhancement is improper under this court's decisions in Dozier and McCollum. I want to start with the trial error. This type of extraction technology requires expert testimony because the jury is unfamiliar with it and jurors have no way to evaluate whether this technology is used reliably in a particular case. So what do you say that Mr. Yeary testified to that required him to be separately designated as an expert? So the key point, Judge Agee, is that this technology is not automatic and it's not and we see that from Celebrate's own materials that say that report an error rate of between seven to ten percent for extractions. So what what what did Yeary testify to that you say required an expert designation? So really it's the absence of what he testified to. So Celebrate says to minimize this risk of error and to point out that he hasn't been qualified as an expert or so but he didn't give any expert opinions. He just basically said I opened the lockbox and took out the documents. So in the problem with that is that Celebrate itself recommends because of this error rate you have to perform these validation techniques. It outlines an expert opinion issue. Expert opinion issue is when the jury needs expert opinion to assist it in making its factual findings and he didn't give any expert opinions. He said what he did and now if you say that's unreliable you can object say the evidence is not reliable but you don't need there's no expert opinion issue in this case. It's basically I took it to a locksmith. He broke open the lock or opened the safe or whatever it was and we took out the contents and that doesn't require an expert. It requires expert skill but not Rule 702 is not limited solely to opinion testimony. If you look at the text of it it applies to testimony. In other words the fact that the guy has experience or lacks experience is not an issue. The question is did he testify as a factual witness and I can't see that he did anything but testify as a factual witness. So the problem with that characterization of his testimony is that this is not a situation where your typical chain of custody is I took possession of the phone and I handed it from one person to the other or I turned it into the evidence locker and signed it in. That's typical chain of custody fact testimony. What he does is take the phone here and he uses this technology to create a report and that gives his stamp of approval. What the jury's led to believe is that the contents of that report accurately reflect what's on the phone. Was there an objection to the reliability of the contents of the report? I would argue that this requires expert testimony under Rule 702. And Judge Conrad... It's not the same thing as saying that it's unreliable. That the product that was introduced into evidence is not reliable. Is there an objection there? So I would contend that is the key objection. I would contend that it is because if you look at Rule 702, C and D are both under Rule 702 focused on reliability. All right. There's no page in the appendix where we're going to see that somebody argued to the trial that this is not reliable evidence. So it's a joint appendix, page 225, and you won't see the word reliable there, to be clear. I don't want to mislead you on that. What you will see is an invocation of Rule 702. And then if you look at Rule 702's text, subsection C and D... What does the objection say to the court, to the judge? It says the government is trying to, I'm quoting here, trying to tender as lay opinion testimony when in fact it's expert testimony under Rule 702. Rule 702 again. What was referring, what's it referring, what's the antecedent to it? Gary's testimony about the extraction he performed. Right. The process of the extraction, but there wasn't, I mean, it's a separate issue as to whether or not the end product itself was reliable in the report. And there was, as best I can tell, there was no express objection to that. So I agree there is no express objection in the sense of arguing specifically reliability or accuracy. We think that's encompassed, and the government is not contended that we failed to preserve this error in any way. I think that it's because invoking Rule 702, which we did at Joint Appendix 225, invokes the reliability tests, the reliability requirements under Rule 702. Was this unreliable? Are you contending that the emails weren't what they were on the phone? Yes, that's exactly, we are contending that we have no way to know whether this is... Software doesn't make up words. No, but again, if you look at Cellebrite's own data, they report 7 to 10 percent of cases where there are errors, misreporting of data, failure to... We have, in this case, we have emails that were taken off those phones. Well, yes, they're texts. Texts, texts, texts taken off those phones. And are there errors that you have pointed out? Yes, there are question marks. The one that was discussed at trial was there's an issue with whether the timestamps matched up between two different sets of relying on a timeline. The precise time is critical. And so we think there's a question about the reliability, whether it was accurate. And the other concern that you would have... You know, I read some of this stuff, and most of it, and there's a text that says, well, I'm waiting here at the mailbox, and I'll be there in 10 minutes, and I'll be waiting, and so forth, and they go back and forth, and then he finally shows up. Well, whatever time she was at that box, it makes those texts and puts them in context, and it certainly doesn't appear to make them inaccurate because it's corroborated by real-life presence. He shows up with the car just as he was predicting on the text. Well, we think that that's actually a little bit backwards because the problem here is the testimony that you referred to, the corroborative testimony from the defendant, has significant problems. We were able to pull this out on cross-examination. He has real credibility issues. The government then referred back to this data. My... What I was pointing out is that the defendant showed up in a vehicle contemporaneously with the way the texts were predicting he would show up. He says, I'm 10 minutes away, I'm on the interstate, and she says, I'm sitting here waiting, and I'm at the mailbox, and then he comes to the mailbox. Now, that fact is not disputed, is it, that they were at the mailbox? Or that the cars came? I don't recall anything particularly about a mailbox, but I... Just a minute. You don't recall anything about... That's the location where the transaction went down, right? Well, there was one that was at a Car Wash and one that was at a Walmart, but I think your question really gets to the question of whether this is prejudicial, because there is all this other evidence that maybe corroborates what is in the text. And our point on harmlessness is that this, the government chose to make these text messages, these phone records, the centerpiece of their case. They did it from the beginning. If you look at Joint Appendix 156, the opening statement tells the jury to pay particular attention to the phones. They carry that focus on this data all the way through the closing. Can you take your own expert look at the phone and compare that data to what came out on this thumb drive that the agent introduced? I mean, why... It seems like to me that if there was some reliability question, that would have come out through your own witness or on cross-examination. So we couldn't do that, because they didn't give notice that there was going to be expert testimony. So typically, you have to give... But they had the phones, and you knew they were going to look at the phones. Right. They had a warrant, right? Right. And so that goes to what makes this case really unusual. In most cases, this is not a problem, because the agent... You could have accessed the phone. You could have filed motions to do that. You could have asked for the... If it's an indigent defendant, you could have asked for the appointment of an expert. You could have yourself sat down and cross-examined each one of these messages that were introduced. I mean, nobody did any of that, did they? I agree, but I will say our view of the problem here is, one, there was not expert notice, and two, these reliability questions are not something that's supposed to be cross-examination for the jury. They are supposed to be, first and foremost, under Rule 702 in the district court's gatekeeping analysis. Let me ask you this. If they seized a lockbox with a safe on it, and they took it to a locksmith and told him to open it, and the locksmith opened it and put the documents inside or handed him the box with the documents accessed, the locksmith comes into court and said, I was handed the box, I opened it, and then I handed the box to the agent. Is that expert testimony? No, and I agree with you, that's not. And the reason it's different here is when you do that, there's no question in that case that what's in the box is what's in the box. Here, there is a question about whether what shows up on this, and I would dispute it's not... He refers to it as a thumb drive, but if you look at Joint Appendix 328, it actually says this is a one terabyte in size, it's a full-on hard drive, which is huge. It's not the typical thumb drives that we carry around. But it leaves open the question is, is this validated through the processes that Celebrite requires? How is this different from downloading files from a computer or a couple of Word documents from a computer? I think the difference is... Would that latter example require expert testimony? I don't think it would either, as long as there's no need for validation that the process that's used is always accurate. Well, the validation goes to reliability, and I guess it goes back to the question of whether or not that was actually preserved here. And we think, again, that it should have been through the district court as part of the gatekeeping. But before we run out of time... Did anybody, in extracting this data, these data from the phones, was there any judgment required as to how to adjust anything? I sort of understood that they just basically plugged in the phones to a program, and then the program downloaded it on... They said a thumb drive. You say it was a hard drive? And so I think our point is that if you read... That was certainly their characterization. We think if you look at Celebrite's actual materials, that's just an inaccurate characterization of how it works. We do think... Celebrite says you need to make sure you're following... That's just factual testimony. He said, I did this, I did this, and I did this. And this is what came out. And you're saying now we have data and information. That's unreliable, but that's authenticity or whatever you want. But it's not opinion because nobody has testified to the reliability at this point of the process. He didn't participate in the process. He just plugged it in and handed the process, right? That's what his testimony is. And we think that's exactly the flaw in his testimony, that he failed to follow the validation procedures. And because of that, we can't know if it's reliable. I do want to turn, before my time is up, to the career offender issue. We think this is a very simple two-part analysis under the Whitley decision. Judge Agee, I know you were on that panel, so you're probably familiar with it. We think under Dozier and McCollum, the answer here is clear. Dozier, like this case, dealt with an inchoate-controlled substance offense. It was attempt here. It's conspiracy. Are we here on plain error? We are, yes. And part of the reason for that is McCollum came out in March. This sentencing was in February. So the sentencing occurred before the court's decision in that case. You're right. And we think that the plainness prong is satisfied because this circuit's precedent is settled by Dozier and McCollum. It's not all that clear. How about Kennedy? So there are two problems with Kennedy and Walton as well. One, we pointed out in the briefing, is no one in those two. See, here's the problem. When you start going into that line of analysis, there are problems here, problems there. How could it possibly be plain if you have to take the time to explain why these precedents might or might not apply? So the reason is that you can't just throw a precedent out there and say, well, this maybe points in a different direction. It has to actually be meaningfully on point, and we think they're not. But let me point Judge Diaz to this court's precedent, which says it's plain if the law of this circuit is settled. We think McCollum and Dozier settle it. We think that's why Whitley was unpublished, because it's a very simple, straightforward analysis. But here's the reasons why Kennedy and Walton don't hold water. It's twofold. First, this issue, whether this 846 qualifies as generic conspiracy, wasn't briefed in that case. This court has said in Hemingway that in cases where it's not briefed, it's not binding. I want to point the court to another decision. That was a holding in it, wasn't it? The holding. If you want to get that point, McCollum dealt with a conspiracy in connection with a crime of violence and tried to find out the distinction between 371 and the overt act. But the conspiracy to commit a drug violation is actually a statute on that, 846, which was not addressed. And 846 statute does not require the overt act, as you know. And so it seems to me, if you're going to apply specifically the conspiracy to commit a drug violation, you'd look at 846. Well, two points on that, Judge Niemeyer. The first is that at footnote 8 of McCollum, it addresses this question and says that nothing in the commentary hints that this word conspiracy has a different meaning based on what the object of the offense is. So we think that controls it. That's because 371 is generic and applies to offenses, but 371 does not apply to an offense for distributing drugs. And one of the things, a conspiracy to distribute drugs, and 846 governs that. And there are other statutes in the same ilk. So I don't think it's altogether clear the reach of McCollum. So I think there's no dispute, I think, that an overt act isn't required in either of the scenarios. But I want to, before I sit down, if you would indulge me, give you the very quick other reason why Kennedy and Walton can't control. And that's that they've been superseded by subsequent in-bank and Supreme Court precedent. If you read those cases as saying that this offense qualifies, there are two problems. They don't mention the categorical approach at all. It's not in either opinion. Neither is the word generic or generic definition. Since that time, this court in Aparicio-Soraya in 2014 said the categorical approach does apply to the guidelines. If you're going to do the categorical approach, you might as well start with Stokely. And Stokely takes the categorical approach. And really, that came out a few weeks ago. Sure. And that takes the categorical approach and tries to find the generic drug beginning with common law. And the common law of conspiracy, as you know, does not require overt act. And that opinion, if you apply that analysis, may overrule McCollum even with respect to crimes of violence. No, that wouldn't be true because Stokely deals with the force clause as opposed to a generic definition of robbery or anything else. No, but it's the approach. You were talking about the categorical approach, the analysis. And I'm suggesting to you that that analysis is in tension with our analysis in McCollum. So I certainly don't think that's true. Which wouldn't help you with the plainness argument. So I think the plainness comes back to Dozier and McCollum were so plain that this court decided Whitley in an unpublished, unargued opinion because it was so straightforward. This court never reverses a district court's opinion. Why would we be acting retroactively then? I'm not quite sure I follow the question. Well, the opinions post-date what the district court did. Oh, because in plain error, the question is always at the time of appellate consideration, not at the time of trial. And that's why we think plainness, again, it focuses on this court's settled precedent as opposed to any of the others. In other words, the error was committed by the district court, you're saying. So it had to be the plain error at the time the district court committed it. No, Judge Neumeyer, that's not right. Under the Supreme Court's decision in Henderson, there used to be this whole debate about when we're considering plainness, do we do it at the time at the district court's consideration, which kind of gives deference to the district courts, or do we do it at some later point? In Henderson, the Supreme Court settled that when we are doing a plainness analysis, we do it at the time of appellate consideration. And now that means I'm not saying you should blame Judge Conrad for missing this. Our lawyer obviously missed the objection, and that was an oversight. So it's not as if we're giving Judge Conrad a hard time that he should have foreseen McCollum was coming. Our point is that settled Supreme Court law in Henderson requires this court to look, is the law settled now? We believe it is based on Dozier, based on McCollum, based on Whitley. Okay, thank you. Thank you. All right. Ms. Ray? Sorry. May it please the court. With respect to the testimony that Yerry provided about Selbright, the defendant did not object on the basis of reliability and instead specifically cited a lack of notice. And the government does resist any argument based on lack of reliability because that objection was not preserved. The only objection that was preserved was whether or not he should have been qualified as an expert under 702. But Mr. Yerry did not provide any opinion testimony that would fall within 701, and his testimony was solely that of a fact witness that testified about what he did. Even if, for some reason, that's- So is Mr. Carpenter correct that an expert need not necessarily give an opinion to be required to be qualified as an expert? Yes. So why is this case different? Because he didn't provide anything that required specialized knowledge. He didn't testify about even the results. He didn't testify about any of the content of what it resulted from running the software. He simply said, I hooked it up to some machines, ran the software, and both the Ninth Circuit and Second Circuit in similar circumstances have held that that doesn't require expert testimony. Well, I mean, you could say the same, I guess, about a DNA analysis, right? I hooked it up to a machine, and here are my results. You're not suggesting that that doesn't require expert testimony, are you? No, because the DNA expert would testify to the results. Yerry didn't testify about the results at all. The agent did, right? The agent did, but they did not challenge the reliability of that. And there's- I guess my concern is, is this sort of an end around by sort of breaking it up into two separate components that you eliminate the need for a qualification of an expert? No, Your Honor. And I think that I don't know enough about DNA technology to conclude whether or not it's a similar process, but I would say that if the court reviews Yerry's testimony, all it was was essentially a chain of custody saying, yeah, I took the cell phones, I ran this report. The defendant could have challenged reliability, at which point the government would have produced an expert that could have talked about why this test- testified to would be reliable. They didn't challenge that. All he challenged was lack of notice. And there was no reason to provide notice for a witness who was simply saying, I plugged it into the machine and provided the results. Doesn't the government have some burden with respect to production as to reliability? I assume yes, but I don't think there's anything that suggests that the information wasn't reliable. In fact, all of the evidence suggests that it was reliable. That's part of why any error would have been harmless, because at the end of the day Aguilera testified that he met with Chavez-Lopez, that they were arranging a cocaine transaction. Both Rios and Berenger testified that Chavez-Lopez was in the car with Fonseca and Aguilera before the transaction actually took place, before the informant. Was the defendant texting even during the transaction when he was standing there? Yes. Yes, Judge Niemeyer. The evidence was that he had his phone. Both the agents testified that he was watching the transaction. He stood there on a traffic island, one of them said, but he turned around and was watching. Not only that, but after Aguilera and Fonseca and the informant and Detective Singh left, he stood there on the island looking agitated, pacing back and forth, looking at his phone repeatedly. And we know from the text messages that he was trying to find out what was going on with Aguilera and he wasn't getting a response. So finally he goes into the Walmart, he stays in the bathroom stall for a length period of time. Was it him that said the $65,000? Yes. And how did that translate to the conversation in the car? What happened in the car after that? In the car the transaction was for two kilograms of cocaine and the testimony from the agent was that it was between $31,000 and $45,000 per kilogram. So the $65,000 IL. The money didn't change hands, did it? It did not. Was there a discussion about the amount in the car? Yes. Which related to the $65,000? Well, I presume so. I'm trying to find out whether there was corroborative evidence in the car that confirmed that the texting was real and not just made up text. I don't think we had a wire in the car. No, I mean you had somebody in the car. We did have a test of right. And I don't remember whether Detective Singh testified that. I mean, I know they discussed amounts, yes. And then what happened was they said, well, we need to go get the money. So they left. And shortly before that he had said $65,000 IL, $65,000, you know. And at the end of the day, the corroborating testimony is also that the testimony that Chavez Lopez is acting as a watch, he's watching the whole transaction, then goes to the bathroom and then shoves the cell phone, tries to shove the cell phone into the water to destroy it. So I would respectfully suggest that all of the evidence, even if this evidence were not admissible, the remaining evidence, this Court can say with fair assurance that the jury would have found this defendant guilty of having participated. I mean, Aguilera testified to that. Didn't the government say that this cell phone evidence was sort of the linchpin of its case? Sure. Sure. The AUSA who argued in closing says this is the linchpin. But we can look at. He was just puffing? Well, I think that, yeah, I actually do think, I do think that he was overstating its significance. That said, he wanted to point out to the jury that we have this evidence, that it was strong evidence, and the government's not suggesting it wasn't strong evidence. It's just that it wasn't necessary for the jury, it wasn't in any way necessary when you have a co-conspirator directly testifying to this. And Mr. Carpenter cites a couple of different cases that suggest that there's no harmless error here, but both of those are easily distinguished. In Ivessevic, the only issue was he excluded the only evidence that was corroborating, and the issue was an intent issue. And then in Insk, or Inka, I don't know how you pronounce that, they're cited in his brief, the only evidence was the ID of the shooter, and the evidence that was improperly admitted was a confession. So in both of those cases, it really was the linchpin. Like, in one case, it was the only evidence that corroborated the defendant's defense, and in the other evidence, it was critical to the government's case. So a linchpin, I guess, is a metaphor for essential, isn't it? And you're saying what she was saying, actually, it's the final nail in the coffin. Right. It sealed the deal. Sure. And at the end of the day, it's this court's job as the court reviewing to look at the evidence and decide how important it was. The prosecutor's representation or characterization of that evidence is perhaps evidence that the prosecutor at that time thought it was important to make it seem like it was really important evidence, and it was solid evidence, but we had lots of other evidence. Turning to the career offender issue, it is not plain or obvious, even today, that Kennedy and Walton don't control. And in Kennedy, this court held, and that holding has stood for 25 years and been repeated over and over again, that an 846 conspiracy offense qualifies as a controlled substance offense under the guidelines. The sentencing commission in the interim not only has not altered, at least 10 circuits say the same thing, and the sentencing commission in those 25 years has not only not changed the guideline, but in the one time, which was right around the time Kennedy was decided, when there were a few circuits who held that it didn't qualify because the sentencing commission did not have authority, the sentencing commission re-promulgated the same guideline to respond to those decisions and cited slightly different additional authority. So in other words, when there was any suggestion by any court that 846 did not qualify as a controlled substance offense, the sentencing commission made clear to buttress it and say, in fact, yes, it is. And that was amendment 528 to the sentencing guidelines. The opposing counsel, as I understand his argument, basically says that McCollum overrules those cases. Right. That's his argument, but McCollum didn't address 846. It did not hold that a controlled substance offense, that it's not a controlled substance offense. And there are some really important differences between the question that was presented in McCollum, which involved an enumerated offense and then a guideline says, is it an offense that prohibits, that hinders the possession with intent to distribute a controlled substance? We don't need the commentary here. We don't need to look at what the generic offense was and how we define conspiracy. Even if you read the commentary, the commentary reads a string of offenses or says a conspiracy for those offenses. But when you link up conspiracy with those fences, the result could be different. A conspiracy under 371 is different than a conspiracy under 841. Right. And that's one of the important differences is there's only one way to have a federal drug trafficking conspiracy and it's 846. 846, I meant, not 841. Sure. It's 846 is the only drug trafficking conspiracy. It's not like we have a myriad of conspiracies as we did in McCollum, where the court was kind of adding up how many states require an overt act and how many don't. There's one type of federal drug trafficking conspiracy. It is 846 and it falls within the text of the guideline itself. Just briefly back to Kennedy. So I understand this argument with respect to McCollum, but you said Kennedy was a holding, but was it really given that it was summarily decided and there was no briefing by the parties? Do we need to go that far? Or is it enough that Kennedy injected some doubt into this situation so as to One, it absolutely makes it clear that it's not plain because we're having the conversation. But two, Kennedy can't be limited in that way. Kennedy was a holding. That authority that Mr. Carpenter cites in Hemingway, for example, the party had not even challenged whether or not Abhan qualified as a predicate. So in Hemingway, the question was whether South Carolina's offensive assault and battery in high and aggravating nature qualified as an adequate predicate under the Career Criminal Act. That was never even presented in the earlier cases. It just simply kind of assumed all of those cases. In Kennedy, the question was directly presented. Does 846 satisfy and qualify as a controlled substance offense? So while the argument may not have been made because it wasn't really at that point. I mean, now I will say Kennedy was after Taylor. So it was post-Taylor. There's not been a Supreme Court case that overruled Kennedy. But Kennedy, the direct question presented was the question that was answered and that is the answer that controls today until this court sitting on bat bunk decides otherwise or until the Supreme Court decides otherwise. It is the earlier decision. It's before McCollum. McCollum could not have overruled it and it did not purport to overrule it, but it was directly presented in a way that the Abhan question was absolutely not presented in Hemingway. This is a different argument. It's not a different that issue wasn't presented. The precise issue was presented and it was precisely decided and it has been decided the same way for 25 years. I do want to mention one other decision just because I think it is one that it's not in my brief and it's also one that I think as I was reviewing for oral argument would be helpful to consider, which is this court's decision in Medina-Campo in which this was a 2017 decision, 714F232. In that decision, the question was whether or not solicitation worked under the commentary to 2L1.2. Medina-Campo. It's a hyphenated name, Your Honor. It's an opinion that Judge King authored and the reason I raise it is because it interpreted controlled substance offense. It was within the context of the 2L1.2 guideline with pretty much identical language. In that case, the court held that solicitation, even though solicitation wasn't listed among the offenses of conspiracy or attempt, that the defendant's conviction for solicitation under Maryland law qualified as essentially a controlled substance offense for purposes of that guideline. I would just refer to the court. I think it's a helpful decision in terms of understanding that we're not always limited. 1B1.1 makes clear that the commentary of includes, when it says includes in the guidelines, it's not limited to that. I think the government's strongest argument remains that the text of the guideline itself obviously encompasses an 846 conspiracy and we don't need to get to the commentary. Even if we get to the commentary, different interpretation is warranted for several reasons. At a minimum, it is not plain. It is not obvious. It wasn't obvious to Judge Conrad and it's certainly not obvious to me that Kennedy has been overruled by Dozier and by McCollum. I want to make one final point about Dozier, which is in Dozier, this court held that the offense qualified was an attempt, that it satisfied the generic definition of attempt. In Dozier, the court didn't really wrestle with at all the question of whether that attempt offense would have qualified under the plain language of the guideline itself. The plain language of controlled substance offense, the court never really asked, would it qualify under that section so that we need not consider the generic definition of attempt? Because when the court looked at the generic definition of attempt, it fit within that. So Dozier doesn't answer the question either. If this court has no further questions, the government requests that this court affirm the judgment of the district court. Thank you. Thank you, Ms. Ray. Mr. Carpenter. I'm going to start with one of the points Ms. Ray made there about the need to consult the commentary here as opposed to doing this straight under the text. Whatever else this court holds, that's a line that it shouldn't go down because it does directly conflict with other precedent. The thing I would point out is that the government wants to interpret the word prohibit to mean hinder. That's not the natural. Say that again, the line we should not go down. That's not the line of reasoning that you should adopt because it's inconsistent with Dozier, for one thing. But to elaborate on why, the government wants to interpret the word prohibit in the text to mean hinder. But that's not the natural meaning of that word. The natural meaning of the word prohibit is to forbid or to make it illegal. And just to give you an example of the difference, so Ms. Ray and I came up from Asheville yesterday and we had some bad weather. That weather hindered us on our trip up here. It didn't prohibit us from coming. It didn't make it illegal for us to come. And so hinder, if you interpret prohibit to mean hinder, it renders almost everything else in the text superfluous. So if you look at the text, it prohibits a controlled substance offense that involves and it lists five verbs, importing, exporting, manufacturing, distributing, or dispensing, and then possessing with intent to do any of those things. If you read prohibit to mean hinder, all of that is totally superfluous. The commission could have simply said anything related to a controlled substance offense falls within the definition. It would have been a lot simpler. We wouldn't have had to do this categorical stuff. Anything that relates in any way to a controlled substance offense would come in if you reinterpret the word prohibit to mean hinder. I would submit that's an incorrect reading. It's inconsistent with Dozier because Dozier says we do this two-step. We look generically at the elements of the INCO8 offense. It has to match the elements of the INCO8 offense in the commentary, and then we do the same thing comparing the object offense. So that line of reasoning, I would submit, is foreclosed and just inconsistent with the text. A couple other things I would point out in response. In addition to Hemingway, one case we didn't cite that we should have is Enrique Grand Jury subpoena. It's 870F3-312. It's a decision from 2017, Judge Diaz. I believe you joined that opinion. It cites at page 318 and 319 two Supreme Court opinions saying that statements that are made about issues not briefed are not considered precedential. We think that resolves this. Kennedy and Walton aren't precedential on the question of whether an 846 You said statements but not holdings, something that was necessary to the resolution of the case, which is Ms. Ray's point about Kennedy. Well, I think the difference is that all of the argumentation in that, and she mentioned the commission repromulgating its amendment and its text, and all of that arose from this challenge to the authority of the commission to say all of this in the commentary. No one contested. No one argued about what the meaning of conspiracy is. And so our point is it would be unfair both to defendants and it would be a poor use of this court's time to say that the fact that the lawyer in Kennedy made an oversight, failed to make this generic argument, binds forever this court unless it convenes in bank. And it binds all these future defendants to be subject to this enhancement without the opportunity to make this argument and allow this court to consider. And again, we think the court has considered this in its subsequent case law. Let me ask you, Ms. Ray suggests that there are 10 circuits that have construed 846 conspiracy to be a drug offense. I agree. What's your response? That's where they are? I don't disagree. There is definitely a circuit split. The commission has proposed. When you say split, who goes the other way? This court and I believe it's the 10th circuit have both explicitly. Well, this court and Dozier and McCollum say that you require an overt act. I believe it's the 10th circuit. This court didn't address in either case 846. Fair enough. The 10th circuit had. I believe it's the 10th circuit that has addressed that. That was, of course, briefed in McCollum as part of that. And we convinced McCollum that he had to follow this. And so one other point I would make about the status of Kennedy and Walton. Again, neither of those cases analyze anything related to the generic definition. So you might read that at the time as a holding that the generic definition doesn't apply in the context of controlled substances, for example. That has been subsequently undermined by the Supreme Court's decision in Moncrief in 2013, which does do a generic definition analysis for controlled substance offense under the INA. And so that, I think, makes clear that you do have to do these analyses, the things that are set forth in Dozier, the things that are set forth in McCollum. We think that 25 years ago there's been a lot of intervening developments, including in-bank decisions, including Supreme Court decisions. The law is clearly settled today in this circuit that you have to follow Dozier and McCollum. We think that's why Whitley did it. We would ask the court to do the same thing here. One final point that I have in my notes here is Ms. Ray referred to the fact that 846 is the only federal conspiracy. It's the only game in town. She said the only drug conspiracy. Yes, sorry, the only drug conspiracy. And that may well be true, but this commentary applies to every state as well. So state offenses can come in under this commentary. The definition that this court adopts applies both to state and federal offenses. That's why we do the generic analysis that the court did in McCollum, that the court did in Dozier. And we look, what is the definition in the majority of states? That's what the Supreme Court recently reiterated that in the Stitt burglary decision. You look at what the majority of states do. That's how you define the generic definition. Here, like the court said in McCollum, the majority of states require an overt act. 846 does not. For that reason, applying those settled precedents, the framework that they set forth, we would ask the court to remand for resentencing on the career offender issue. Thank you, Mr. Carpenter. We'll come down and greet counsel and then proceed on to the next case. Thank you.
judges: Paul V. Niemeyer, G. Steven Agee, Albert Diaz